OPINION
{¶ 1} Earl Ingle appeals from the judgment of the Montgomery County Common Pleas Court granting him a final divorce from his former spouse, Beverly Ingle.
 {¶ 2} The Ingles were married on April 23, 1988 and they had no children. On December 19, 2003, Earl filed a complaint for divorce from Beverly and on February 10, 2004, Beverly answered the complaint and counterclaimed for a divorce. The parties filed pre-trial statements with the court and the matter was set for trial on November 8, 2004. On the day of trial, the trial court converted the final hearing to a pre-trial and ordered the parties to obtain appraisals of the marital home in Bellbrook, Ohio and the duplex rental property on Huffman Avenue in Dayton. The matter was continued for trial on March 2, 2005. On March 1, 2005, Earl moved for a continuance of the trial date contending he had insufficient time to review additional discovery provided by Beverly on February 26, 2005. The trial court granted Earl's continuance motion and set the matter for trial on June 22, 2005. Magistrate Kimberly Stump indicated no further continuances would be granted. The matter was again continued to accommodate Earl's counsel who had a scheduling conflict until July 29, 2005.
 {¶ 3} On the day of trial, the Ingles appeared in court with their counsel and informed the court they had reached an agreement to divorce each other and settle their dispute as to spousal support and division of the marital assets. Counsel represented that the parties had agreed that Beverly would receive spousal support for six years and the Ingles would divide their personal and real property equally. Specifically, Beverly's counsel represented that her client would receive $128,750 as her equity in the marital residence and $25,000 as her equity in the appreciated value of the Huffman Avenue duplex which Earl owned prior to the parties' marriage. The following occurred in open court:
 {¶ 4} "My client would be entitled to $128,750 from that or will be entitled to that and I will give a final figure here momentarily. In addition, there is real estate located at Huffman Avenue in Dayton.
 {¶ 5} "THE COURT: What's the address of that?
 {¶ 6} "MS. CROSSMAN: I'm sorry. 1641 and 1642. It is an apartment, if you would.
 {¶ 7} "MR. KIRKLAND: 43, ma'am.
 {¶ 8} "MS. CROSSMAN: Or 43. 1641 and 1643 Huffman Avenue, Dayton, Ohio. And this property was purchased prior to the marriage; however, there is marital equity, some marital equity associated with this. The parties have agreed that Mrs. Ingle is entitled to $25,000 as her marital equity. Are you in agreement —
 {¶ 9} "MS. INGLE: Yes.
 {¶ 10} "MS. CROSSMAN: — with that? And, Jim, is your client in agreement with that?
 {¶ 11} "MR. KIRKLAND: Uh-huh, yes.
 {¶ 12} "MS. CROSSMAN: Therefore, the total sum that Mrs. Ingle would receive would be $153,750. However, in addition, there is a line of credit home equity loan associated with the property on Upper Bellbrook Road. Mrs. Ingle — the balance, current balance is $7,000.
 {¶ 13} "Mrs. Ingle has agreed to take $7,000 less from that equity. Mr. Ingle will resume — will assume the debt associated with that. Mrs. Ingle will retain her automobile free and clear then. So the total amount of equity Mrs. Ingle will receive will be $146,750. And, Jim, is your client in agreement with that?
 {¶ 14} "MR. KIRKLAND: You in agreement, sir?
 {¶ 15} "MR. INGLE: No.
 {¶ 16} "MR. KIRKLAND: All right.
 {¶ 17} "MS. CROSSMAN: Okay.
 {¶ 18} "MR. KIRKLAND: And what's your agreement on the properties?
 {¶ 19} "MR. INGLE: Well, my agreement is that I would like for her to leave my Huffman alone.
 {¶ 20} "THE COURT: Okay, sir, you under —
 {¶ 21} "MR. INGLE: Yeah, I had that before.
 {¶ 22} "THE COURT: Wait, stop. You understand that we are reading a global settlement agreement into the record. If I find that you're not entering into this agreement, we need to go forward and take testimony. And I will be the one that decides who gets what, what properties are valued at. And you run the risk of me deciding even more in her favor or even less in her favor. So if you don't agree here today, I can't put a settlement agreement on something you don't agree on here today.
 {¶ 23} "MR. INGLE: Well, I don't agree on it.
 {¶ 24} "MR. KIRKLAND: Well, no. I think we're fine. If he's not going to agree on it, then I'm going to move to withdraw. Well, that's where we're going to be.
 {¶ 25} "MS. CROSSMAN: Let me just — let me just explain further on Huffman Avenue. Your Honor, we had — we had two appraisals.
 {¶ 26} "MS. INGLE: (Inaudible.)
 {¶ 27} "MS. CROSSMAN: Be quiet. We had two appraisals done. The appraisal was for 100 — I'm sorry — was for $82,000. That was a current appraisal. There was no appraisal presented by Mr. Ingle for the value of the property as of the date of marriage. We had one done, the value being 32,000. Therefore, we arrived at marital equity of 50,000, resulting in the 25,000. There has been no issue of that raised by Mr. Ingle until today.
 {¶ 28} "MR. KIRKLAND: The — we did appraisal of the value at the time, and I think we were at 35. So there was no difference in the figure basically, so we didn't have that. I've explained to Mr. Ingle the aspect of — of use of marital funds during the marriage, even on a prior property and have explained that throughout, including today, etc. It's my understanding that he understood that. So that's my answer to that.
 {¶ 29} "THE COURT: You understand, Mr. Ingle, that — and I'm sure your counsel has explained to you that anything that is owned as part of the marital, marital moneys are put into it, it's going to be your responsibility to prove to me that it's separate property. It's assumed that's it's marital. It's your responsibility to prove to me that it's separate property.
 {¶ 30} "Even if it would be separate property, she's going to be entitled to certain sums of money as marital, if marital funds were put into the property, if the property was enhanced by the effort of either her hands or her money or money that was invested during the — the marriage.
 {¶ 31} "I also want you to understand that if you had previously agreed that everything had been settled and you are intending now to not hold up to that settlement, I have the authority to grant additional attorney's fees to Mrs. Ingle. And I can find that this is a delay tactic. And if I do find that it is a delay tactic, she will get additional attorney's fees that you're going to be responsible for paying.
 {¶ 32} "I'm not trying to force you into a settlement agreement you don't want. I just want you to understand the risks that you incur by not going forward today. We have already postponed and postponed and postponed this case as far as it can be. I'm in heat with the Ohio Supreme Court because your case has not been done. All right.
 {¶ 33} "MS. CROSSMAN: Your Honor, perhaps — well — Jim, do you need a few minutes to speak with your client?
 {¶ 34} "MR. KIRKLAND: I — I'll go out for a few minutes with —
 {¶ 35} "THE COURT: You get five minutes.
 {¶ 36} "MR. KIRKLAND: Thank you. Come on. Just leave your stuff.
 {¶ 37} "MR. INGLE: You want me to come along?
 {¶ 38} "MR. KIRKLAND: Yeah.
 {¶ 39} "(A recess was taken.)"
 {¶ 40} After a short recess, the Magistrate reconvened and she asked Earl's counsel if there was any change from the agreement which was previously read onto the record. Beverly's counsel asked Earl if the prior agreement was acceptable and Earl replied that it was. (T.15.) Counsel then read into the record the parties' agreement concerning the division of the parties' bank accounts, stock, personal property, and retirement pension. Then Earl's attorney addressed his client on the record accordingly:
 {¶ 41} "MR. KIRKLAND: Yes. Mr. Ingle, you have heard the total separation agreement. And certain phases of it we asked your approval, and other phases we have that you've heard the items read in. Since we've been back, you've been able to have my explanations throughout the case, including today in the presence of Mr. Thunderburg also.
 {¶ 42} "I want to make it known that I am not telling you to say yes or no. My job is to advise and consult. The question in front of you is asked by the Magistrate: Do you agree with the terms of the property settlement? The answer is yes or no, is your answer.
 {¶ 43} "MR. INGLE: Yes.
 {¶ 44} "THE COURT: All right."
 {¶ 45} At the conclusion of the hearing, the Magistrate concluded both parties were entitled to a divorce on the grounds of incompatibility and concluded that the parties' settlement agreement had been voluntarily made. (T. 38.)
 {¶ 46} The Magistrate ordered Beverly's counsel to prepare a decree of divorce and a Qualified Domestic Relations Order by September 1, 2005. On September 14, 2005, Earl's new counsel requested a hearing on the proposed divorce decree submitted to Earl by Beverly's counsel. On September 20, 2005, the trial court issued a final divorce decree and QDRO prepared by Beverly's counsel and signed by the magistrate and the trial judge. The decree provided that the "parties had reached an agreement on all issues in this case after lengthy negotiations and guidance from the Court." On September 26, 2005, Earl's new counsel filed a notice of appeal.
 {¶ 47} In a single assignment, Earl contends the trial court abused its discretion when it approved the parties' settlement agreement. Earl contends he was subject to undue influence and duress in agreeing to the in-court settlement of the divorce proceeding. Earl contends the record demonstrates that both his counsel and the magistrate unduly pressured him into accepting the terms of the agreement against his better judgment.
 {¶ 48} Earl argues he was subjected to undue influence by the magistrate when she informed him "he might end up worse off than he already felt if she was the one deciding the values if he chose not to agree to this settlement." (Appellant's brief at 4.) He also argues the magistrate exerted undue influence in threatening to award additional attorney's fees if she found he previously agreed to the settlement and reneged on that agreement. Lastly, he argues he was forced to agree to the settlement when his counsel threatened to withdraw from representing him in the middle of the trial.
 {¶ 49} Beverly argues we should overrule the assignment because Earl did not file a timely objection to the magistrate's decision. She also argues that Earl did not demonstrate that the magistrate abused her discretion in finding that Earl voluntarily entered into the in-court settlement agreement. Lastly, Beverly argues that Earl failed to demonstrate any prejudice from the alleged "improper influence."
 {¶ 50} We find that Earl did not waive his right to assign as error on appeal the finding of the magistrate that Earl had voluntarily entered into the settlement agreement. Although the magistrate made a finding on the record that Earl had made a voluntary agreement, the magistrate did not file a magistrate's decision as required by Civ.R. 53(E)(1).
 {¶ 51} The parties agree that Earl bears the burden of providing by clear and convincing evidence that he was subjected to undue influence in agreeing to the in-court settlement agreement. The elements of undue influence are (1) a susceptible party, (2) another's opportunity to influence the susceptible party, (3) the actual or attempted imposition of improper influence, and (4) a result showing the effect of the improper influence. West v. Henry (1962), 173 Ohio St. 498, 501. While a separation agreement is generally required to be fair and equitable, where the parties have dealt at arms length with each other rather than in a confidential relationship, the test is whether the agreement is the product of fraud, duress, or undue influence upon the party in the weaker bargaining position.DiPetro v. DiPetro (1983), 10 Ohio App.3d 44. When the parties enter into a settlement agreement in the presence of the court, such an agreement is a binding contract and neither a change of heart nor poor legal advice is a ground to set aside a separation agreement. Walther v. Walther (1995), 102 Ohio App.3d 378,382-383.
 {¶ 52} In this matter, appellant was not a susceptible party. He was represented by an experienced and highly competent lawyer who specializes in domestic relations law. There was no evidence that appellant was not competent to enter into a settlement of his contested divorce proceeding. Although appellant initially expressed misgivings about sharing with appellee the increase in the equity of the Huffman Avenue property which appellant owned before the marriage, he later stated he was agreeable to the division of the monies as they related to the real estate. (T. 15.)
 {¶ 53} We do not agree with appellant's contention that he was subjected to undue influence by the magistrate when she merely informed appellant that he might end up with a less desirable result than the agreed settlement should the court rule on the matter. We also do not believe the magistrate exacted undue influence upon appellant by admonishing him that the court might also award attorneys' fees to appellee if the court found appellant acted in bad faith in rejecting the parties' prior agreement to settle their divorce action. See Walther v.Walther, supra at 383.
 {¶ 54} Lastly, appellant contends he was forced to accept the in-court settlement because his lawyer threatened to withdraw from the case if he repudiated what his counsel believed to be the parties' agreed upon disposition of the parties' real estate. The record reveals that the magistrate recessed the proceedings so that appellant and his counsel could discuss the appellant's concern about the Huffman Avenue property. Presumably counsel reiterated what the magistrate had advised appellant that separate pre-marital property may be subject to equitable division if it is enhanced by the parties' post-marital efforts. In any event, appellant returned to the courtroom after consulting with his experienced counsel, who advised him on the record he was not telling him to accept the in-court settlement, but was merely providing him his advice to do so. Appellant stated he agreed with the terms of the property settlement.
 {¶ 55} We find that appellant has failed to demonstrate by clear and convincing evidence that he was subjected to undue influence in agreeing to the in-court settlement of the parties' divorce proceeding. The assignment of error is Overruled. The Judgment of the trial court is Affirmed.
Fain, J., and Donovan, J., concur.