[Cite as *Bernholtz v. Bernholtz*, 2022-Ohio-4764.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY


Lois Bernholtz                                        Court of Appeals No.  F-22-002

      Appellee                                       Trial Court No. 2020CV000083

v.

Brian Bernholtz, et al.                        **DECISION AND JUDGMENT**

      Appellants                                    Decided: December 29, 2022

* * * * *

James P. Silk, Jr., for appellee

Jeffrey P. Nunnari, for appellants.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellants, Brian and Heidi Bernholtz, appeal the judgment of the Fulton County Court of Common Pleas, following a bench trial, which found in favor of appellee, Lois Bernholtz, on her claims for conversion, fraud, breach of fiduciary duty, and intentional infliction of emotional distress.  For the reasons that follow, we affirm, in part, and reverse, in part.

## I. Facts and Procedural Background

{¶ 2} Lois Bernholtz ("Lois") and Calvin Bernholtz ("Calvin") are the parents of Brian Bernholtz ("Brian") and Deborah Beroske ("Deborah"). Calvin is now deceased. By way of background, Lois and Calvin maintained the family home in the middle of what was originally a 40-acre plot of land. Prior to any of the facts giving rise to this appeal, Lois and Calvin transferred approximately 11 acres of land to Brian, and 11 acres of land to Deborah. Brian and Deborah lived next door to Lois and Calvin on the land that was given to them, respectively.

{¶ 3} The present matter was initiated when Lois filed a complaint against Brian and his wife, Heidi, raising claims of conversion, fraud, breach of fiduciary duty, and intentional infliction of emotional distress. The gravamen of the complaint was that Brian and Heidi used their positions of trust to exert undue influence on Lois and Calvin, ultimately resulting in the transfer of real property and the conversion of tens of thousands of dollars in cash and personal property. The matter proceeded to a trial before the bench where the following evidence was presented.

{¶ 4} Deborah testified that she enjoyed a good relationship with her parents and with her brother, Brian, until 2014 when Brian married Heidi. At that time, the family relationships soured.

{¶ 5} Deborah testified that on October 4, 2016, her parents were involved in a serious car accident. As a result of the accident, Calvin suffered brain trauma, was confused, and had difficulty walking. Calvin was released from the hospital later that

2.

same day. Deborah visited Calvin the following day at his house. Deborah testified that Heidi and Lois left Calvin home alone so that they could go pick up a dog from the airport. She described that Calvin had dirty bandages, had not eaten or taken his medication, the phone was not charged so he could not call 911 if he needed to, and there was dog poop all over the floor.

{¶ 6} Shortly after the accident, Lois asked to meet Deborah in secret, and they eventually met at a greenhouse. Deborah testified that Lois appeared thin and nervous, and seemed to be worried that she was going to be caught meeting with Deborah. Deborah testified that Lois told her that "she wanted help, she wanted guardianship, she wanted out." Appellants objected to this testimony as hearsay, but the trial court overruled the objection, finding that it was not being offered for the truth of the matter asserted, but was being offered to provide the background to the story. Deborah then authenticated a hand-written note dated October 9, 2016, signed by Lois, which stated, "I, Lois Bernholtz, am requesting that Steve and Debbie Beroske become guardians, guardianship of me, and Cal Bernholtz."

{¶ 7} Deborah testified that she was worried about elder abuse. According to Deborah, she was told that she was not allowed to go to the family home, or else she would be arrested. Deborah testified that she suspected that Brian and Heidi were taking all of Lois and Calvin's money, there was not enough food for her parents, and her mom was being forced to run all of the errands and clean Brian's house. Deborah reported the suspected elder abuse to the appropriate authorities, but nothing came of her report.

3.

{¶ 8} At some point, Calvin became ill and went into Hospice. Deborah testified that Brian prevented her from visiting her dad, and after Calvin died on October 29, 2017, Brian did not even tell her about the funeral service.

{¶ 9} Deborah testified that Lois started living with her on July 27, 2019. When Lois moved in, she weighed less than 100 pounds, and she was nervous about everything and felt like she had been drugged. At the time of the trial, Deborah testified that Lois was now doing much better; she had gained 20 pounds, laughs and jokes, and gets to see her grandkids and great-grandkids.

{¶ 10} The day after Lois moved in with Deborah, they attempted to retrieve some of Lois's things from the family home, but they were locked out. Lois was surprised to learn that she no longer owned the family home, and that it had been transferred to Brian. Eventually, Lois was able to retrieve some of her items from the home.

{¶ 11} Deborah also testified that shortly after the family home had been transferred to Brian in January 2017, she received a handwritten note in her mailbox purportedly from Lois, in which Lois stated "Please do not stop down to the house. This is my written warning. I advised sheriff department to stop visiting. Thank You, Lois Bernholtz."

{¶ 12} Deborah next testified to Lois's financial situation. Deborah testified that she went through Lois's bank statements with her and discovered numerous purchases of which Lois was unaware. Deborah testified that Lois did not know how to use the pin function on a debit card, that she did not know how to use a computer, and did not know

4.

how to access her account electronically. However, the bank statements showed numerous transactions involving Paypal, iTunes, etc. Deborah totaled the transactions that were made using the pin number between 2017 and 2019, and the amount of the purchases was approximately $84,000. The transactions also included approximately $5,000 in veterinary bills, yet Lois's dogs had not been seen by the veterinarian in two years. Notably, Heidi was a joint account holder with Lois until the account ran out of money, at which point Heidi removed herself from the account.

{¶ 13} Lois's sister-in-law, Rose Johnson, testified next. Rose testified that in July 2019 she went with her husband to visit Lois after Calvin had passed. Rose noticed that Lois did not look good, she was thin and told Rose that she was not eating much and was not taking her medicine. Rose looked in the refrigerator and found that there was not any food. Rose determined that Lois should go visit Deborah, and because of Lois's condition, decided that they she should go visit her that day. That night, when Lois returned to the family home, it was locked, so Lois returned to spend the night with Deborah. The next day, Rose went with Lois back to the family home, but it was still locked. Deborah had to call the sheriff on several occasions to get into the home, and finally after a couple of days, Rose was able to get into the family home with Lois. When they went in the home, Rose noticed that some of the items, such as Lois's television and a golf cart, were missing.

{¶ 14} Lois testified next. In general, Lois, then 78 years old, had difficulty remembering any of the events. Lois acknowledged that she transferred approximately

5.

15 acres of farmland surrounding the family home to Brian on May 17, 2016, that she signed the note requesting a guardianship on October 9, 2016, that she signed a power of attorney naming Brian as her attorney-in-fact on October 12, 2016, and that she transferred the family home to Brian on January 21, 2017. However, Lois gave conflicting answers on whether or not she remembered doing those things, but determined that she must have intended to do so at the time since she signed the forms. Lois did testify that she did not think that Brian or Heidi improperly influenced her to give her property to them. Lois also testified that she did not recall writing a note in January 2017, informing Deborah not to come to the family home. Lois stated that she would not have wanted to prevent Deborah from visiting.

{¶ 15} As far as her banking habits, Lois testified that she did not remember whether Heidi was a joint account holder with her. Lois also testified that she thought she had a debit card, but she was not sure. Lois stated that she did not know that she had a pin number for the debit card, did not know how to enter a pin number, and had never entered a pin number before. In addition, Lois testified that she did not own a computer, and had never made a bank transfer from her phone or computer. Regarding specific transactions, Lois testified that Paypal was used to purchase dogs, noting that she had four dogs, and Heidi was a dog breeder. She explained that the veterinary bills were partly for her dogs and partly for Heidi's dogs. However, Lois was completely unfamiliar with a $700 purchase at Sephora, or transactions involving iTunes or GameStop.

6.

{¶ 16} On cross-examination, Lois testified that she spent a lot of time with Heidi and would accompany Heidi on errands. Lois felt that her relationship with Heidi was friendly, and did not think that Heidi ever treated her badly. She also testified that she was not forced to clean Brian's home, and was not prevented from having people come visit her.

{¶ 17} On questioning from the court, Lois testified that she thought she lived frugally, but that Calvin might have disagreed. Lois described their big treat as going out to dinner once or twice a month. Lois testified that she also drove nice used cars, but that her current car was purchased new, and she could not remember what types of cars she has had.

{¶ 18} Thereafter, Lois rested her case.

{¶ 19} Appellants, for their part presented three witnesses. The first witness was Julia Gorrell, a legal assistant for a law firm in Swanton, Ohio. Gorrell's testimony was ultimately curtailed on the basis of attorney-client privilege.

{¶ 20} The next witness to testify was Heidi. Heidi testified that she had a good relationship with Lois, and that Lois was her best friend. The two of them would go on little adventures together because Lois had spent most of her life in the home caring for children, and Heidi wanted to help Lois experience new things. Heidi also testified that she was a caregiver for Lois and Calvin, and would take food to them. Sometimes, Lois enjoyed coming over to Brian's house to do some cleaning.

7.

{¶ 21} Regarding the checking account, Heidi testified that she became a joint holder of the account after Calvin died because Lois had been bouncing checks and overdrawing the account. Heidi helped Lois with the account, and would deposit money into the account if it had become overdrawn. Heidi stated that she showed Lois how to use the debit card, but testified that she, herself, never put any charges on the account or wrote checks out of the account. Heidi admitted that sometimes Lois would buy groceries or other items for Brian, but she explained that those purchases had been happening long before she married Brian. Heidi further testified that when she went shopping with Lois, Lois would have items, and Heidi would have a separate cart with her own items. Heidi surmised that Lois's account would become overdrawn because Lois was a big-hearted, generous person who could not say no to people. As to the veterinary bills, Heidi testified that Lois would pay the bill and Heidi would reimburse her with cash.

{¶ 22} On the day that Lois moved out, Heidi testified that she noticed Lois was gone when she arrived to bring some food to her. Heidi was worried that Lois had fallen and gotten injured, but was eventually informed that Lois was okay and that she no longer wanted to live in the family home. Heidi testified that when she went back into the home after Lois had an opportunity to gather her things, she noticed that some of her items such as a washer, dryer, and television were missing.

{¶ 23} On cross-examination, Heidi testified that she was added to Lois's account to help Lois keep track of her finances, but could not explain why she could not have

8.

helped Lois without being added to the account. When asked about specific purchases on the account, Heidi could not recall most of them. However, Heidi stated that she worked long hours, and was not aware of who else Lois may have gone shopping with, or other people that Lois may have made purchases for. Notably, Heidi also acknowledged that she had a prior conviction for receiving stolen property from nine or ten years ago.

{¶ 24} Heidi was also asked to describe Lois's physical and mental condition when she stopped residing in the family home in July 2019. Heidi stated that she did not know, and was not sure, explaining that she was not a doctor.

{¶ 25} The final witness to testify was Brian. Brian testified that he had a good relationship with his father and mother, and that he would often help them take care of their property. He said that Deborah, on the other hand, did not help with taking care of their parents after she and Calvin had a falling out. Brian testified that his parents transferred approximately 15 acres of farmland to him in May 2016, because at that moment Calvin and Lois were both in a sound mind, but they knew that Calvin's health could diminish at any time. Notably, Calvin had been diagnosed with leukemia around 1997. Brian testified that he did not try to convince or coerce his parents to give him the property. Brian also explained that his parents gave the property to him and not Deborah because of the fractured relationship between Deborah and Calvin. Similarly, Brian testified that he did not put any pressure, convince, or coerce his parents to transfer to him the remaining two acres that included the family home in January 2017. Although he owned the family home after the transfer, Brian's intention was that his mother would

9.

continue to reside there. Brian did not charge his mother rent, and he testified that he paid all of the utilities and taxes. On cross-examination, however, Brian admitted that Lois paid the bills and property taxes until she moved out.

{¶ 26} Brian testified that he never forced his mother to work in his home, but that sometimes she would come to his house and help clean or do some laundry. Brian testified that he would likewise help maintain the family home, cleaning up fallen branches, spraying for weeds, mowing the lawn, and fixing anything that broke inside of the home.

{¶ 27} When Lois left the family home in July 2019, Brian discovered that she was gone when he came to bring her dinner and she was not there. Brian testified that he contacted the sheriff and looked all over for her, but only found out from the sheriff the next day that she was okay. Brian testified that he did not ask Deborah if she knew where Lois was because he was not allowed to speak to Deborah. Brian testified that he locked the door that night, and did not go back into the house to take any property. He acknowledged that a restraining order was placed against him, and the courts had to order him to allow Lois to come back into the family home to take her belongings, but he testified that no one asked him to come into the home before then. He testified that after Lois took her belongings, Heidi's washer, dryer, and television were missing.

{¶ 28} Regarding purchasing groceries, Brian testified that sometimes Lois would purchase things for him, but he never put any pressure on her to do so.

10.

{¶ 29} On cross-examination, Brian was asked about the power of attorney that was signed in October 2016. Brian testified that the power of attorney was more important for Calvin than Lois because Calvin's health was declining. However, at an earlier deposition, Brian had testified that Lois's mental health and dementia was also a concern when the power of attorney was executed. There was no testimony that Brian took any actions using the authority granted to him by the power of attorney.

{¶ 30} Finally, in explaining the property transfers, Brian agreed that part of the motivation was the possibility that Calvin would incur significant medical bills. But on questioning from the court, Brian acknowledged that his parents were on Medicare and had a supplemental insurance policy from Calvin's Jeep pension.

{¶ 31} Following the hearing, the parties submitted proposed findings of fact and conclusions of law, and responses to the opposing party's findings of fact and conclusions of law. Thereafter, on December 16, 2021, the trial court entered its judgment in favor of Lois. In general, the trial court did not address the specific claims of conversion, fraud, breach of fiduciary duty, or intentional infliction of emotional distress. Instead, the trial court treated the case as one in which appellants exerted undue influence over Lois and Calvin.

{¶ 32} As to the property transfers, the trial court found that Brian had a confidential relationship with Lois and Calvin by virtue of his power of attorney over his parents, and that the property transfers occurred after the power of attorney had been established. Specifically, the trial court found that the transfer of the 15 acres of

11.

farmland occurred in October 2016, and that three days later, Deborah received the note ostensibly written by Lois, instructing Deborah not to visit or the sheriff would be called. The court also found that the transfer of the remaining two acres and the family home occurred in January 2017. The court viewed Brian's explanation that the property was transferred to protect it from Medicaid with skepticism.

{¶ 33} In addition, the court found that at the time of the transfers, Calvin was in poor health and susceptible to undue influence. Likewise, the court found that Lois was suffering from dementia and was unable to take care of her own affairs, and thus was also susceptible to undue influence.

{¶ 34} Because Brian had a confidential relationship with Lois and Calvin, the trial court held that the property transfers were presumptively the result of undue influence, and Brian did not submit any credible evidence to rebut that presumption. The trial court found that there was no credible evidence that Lois or Calvin acted voluntarily and with a complete understanding of the consequences. Therefore, the trial court held that Lois demonstrated by clear and convincing evidence that the real estate transfers were secured by undue influence and must be set aside.

{¶ 35} As to the expenditure of funds, the trial court found that Lois was never capable of using modern commercial transfers such as using the ATM or making telephone or internet transfers. The court found that Heidi's testimony was not at all credible. In making this determination, the trial court cited Heidi's hostility on the stand, lack of frankness, and inability to make eye contact. In addition, the trial court noted that

12.

Heidi was added to the account after Lois received significant sums of money after Calvin's death, and withdrew her name after all the money was gone, and that Heidi could not remember most of what the money was spent for despite being present when the money was withdrawn.

{¶ 36} The court found that Lois lived a frugal life. The court concluded that the extensive and reckless expenditures were out of character for Lois, and this, coupled with the use of online or pin transactions, convinced the court that Heidi and Brian were using their influence over Lois to enrich themselves at Lois's expense. Furthermore, the court found that Heidi had a fiduciary responsibility to Lois by virtue of her being a co-owner of the banking accounts. But, instead of exercising any type of fiduciary responsibility, Heidi took advantage of Lois for her and Brian's benefit. In so finding, the court noted that the transfers were clearly orchestrated by Heidi. Therefore, the court held that Lois demonstrated by clear and convincing evidence that she was entitled to $111,742.32, consisting of $8,142.21 in PayPal charges, $600.00 for an auto loan, $4,872.11 for veterinary bills, $14,292.00 for two telephone transfers, and $83,832.00 for pin transactions from the checking account.[1]

## II. Assignment of Error

{¶ 37} Appellants have timely appealed the trial court's judgment, and now assert one assignment of error for our review:

---

[1] The total sum of the itemized expenditures is $111,738.32, not $111,742.32.

I.  The judgment of the trial court is contrary to, and against the manifest weight of, the evidence.

### III. Analysis

{¶ 38} "In an appeal from a civil bench trial, we generally review the trial court's judgment under a manifest-weight standard of review." *Bonner v. Delp*, 2021-Ohio-3772, 180 N.E.3d 11, ¶ 38 (6th Dist.), quoting *Mike McGarry & Sons, Inc. v. Const. Resources One, LLC*, 2018-Ohio-528, 107 N.E.3d 91, ¶ 90 (6th Dist.).  In so doing, "[w]e weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered." *Mike McGarry & Sons* at ¶ 90, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.  "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C. E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 39} In support of their assignment of error, appellants present four arguments.

### A. Trial Court Considered Evidence Outside of the Record

{¶ 40} First, appellants argue that the trial court relied on evidence outside of the record when it found that prior to the acts in question, Lois and Calvin originally owned 40 acres of land, from which they transferred approximately 11 acres each to Brian and

Deborah. Appellants contend that the trial court relied on these facts to determine that the relationship between the parties was good prior to the acts in question, causing the court to question a distribution of property that favored Brian over Deborah. However, these facts were not disputed at trial, were testified to by Brian and Deborah, and were even included in appellants' proposed findings of fact in their post-trial brief. Therefore, we find that this argument has no merit.

## B. Trial Court Considered Inadmissible Hearsay

{¶ 41} Second, appellants argue that the trial court's decision was based on inadmissible hearsay. While asserting that Deborah's testimony was replete with hearsay, appellants only cite two examples.

{¶ 42} The first example is Deborah's testimony that when Lois met her at the greenhouse shortly after the car accident, Lois stated that she was overwhelmed, requested a guardianship, and wanted out. Although the trial court referenced this fact in its decision, it is not clear in what way the trial court relied on this evidence, and appellants do not offer an explanation. It appears to us that most likely the trial court considered this evidence in its determination that Lois was susceptible to undue influence, but this particular fact seems of less importance given that Brian testified that Lois was already suffering from dementia. More importantly, appellants conceded in their post-trial brief, and on appeal, that Lois was susceptible to undue influence.

{¶ 43} The second example is Deborah's testimony on cross-examination that Calvin told her that Brian said the property should be transferred to him so that the state

could not take it if Calvin went on Medicaid. Notably, appellants elicited this testimony, and did not object to it. Further, Brian himself testified that Medicaid and his father's medical bills were considerations for the property transfer. Therefore, we find that appellants' argument that the trial court improperly relied on hearsay is without merit.

### C. Trial Court's Decision is not Supported by Competent, Credible Evidence

{¶ 44} Third, appellants argue that the trial court failed to consider important facts in its decision. This argument is related to appellants' fourth argument, which is that the trial court's decision was not supported by the evidence. In addressing appellants' arguments, we find it helpful to separate the trial court's findings relative to the transfer of property from the findings relative to the expenditure of funds from Lois's checking account. But, initially we note that in both cases, the trial court found that the transfers were the result of undue influence.[2]

---

[2] Appellants passingly object to the trial court's reliance on undue influence when it was not a pleaded cause of action, but they do not present any legal argument that the trial court erred in relying on the undue influence theory. Notwithstanding appellants' lack of argument, we note that Civ.R. 15(B) provides, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. * * * Failure to amend [the pleadings] as provided herein does not affect the result of the trial of these issues." "Various factors to be considered in determining whether the parties impliedly consented to litigate an issue include: whether they recognized that an unpleaded issue entered the case * * *; whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be retried on a different theory * * *; and whether the witnesses were subjected to extensive cross-examination on the issue * * *. (Internal citations omitted.) *State ex rel. Evans v. Bainbridge Twp. Trustees*, 5 Ohio St.3d 41, 45-46, 448 N.E.2d 1159 (1983). Here, the issue of undue influence permeated the trial from the complaint, through the trial briefs submitted before the start of trial, and to the post-trial proposed findings of fact and conclusions of law, all without objection from

16.

**{¶ 45}** "The elements of undue influence are (1) a susceptible party, (2) another's opportunity to influence the susceptible party, (3) the actual or attempted imposition of improper influence, and (4) a result showing the effect of the improper influence." *Bayes v. Dornon*, 2015-Ohio-3053, 37 N.E.3d 181, ¶ 49 (2d Dist.), quoting *Ingle v. Ingle*, 2d Dist. Greene No. 2005CA110, 2006-Ohio-3749, ¶ 51; *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962). "Where a confidential or fiduciary relationship exists between a donor and donee, the transfer is looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee." *Studniewski v. Krzyzanowski*, 65 Ohio App.3d 628, 632, 584 N.E.2d 1297 (6th Dist.1989), citing *Willis v. Baker*, 75 Ohio St. 291, 79 N.E. 466 (1906). "In such circumstances a presumption arises, and the party with the superior position must go forward with proof on the issue of undue influence and fairness of the transaction while the party attacking a completed gift on that basis retains the ultimate burden of proving undue influence by clear and convincing evidence." *Id.* "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts

appellants and with their active participation in presenting evidence relating to the issue. Thus, in our view, appellants impliedly consented to the theory of undue influence being an issue in the trial.

17.

sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

### 1. Transfer of Real Property

{¶ 46} In finding that the property transfers to Brian were the result of undue influence, the trial court relied on the fact that Brian had a confidential relationship with Lois and Calvin by virtue of his holding a power of attorney. In its findings of fact, the trial court correctly found that Lois and Calvin executed a power of attorney naming Brian as their attorney in fact on October 12, 2016. Because of this confidential relationship, the trial court found that Brian bore the burden of demonstrating that the transactions were free of undue influence. The court found that Brian failed to satisfy his burden regarding both the transfer of the 15 acres of farmland, and the transfer of the remaining two acres that included the family home.

{¶ 47} As to the transfer of the 15 acres of farmland, the trial court's conclusion is based upon a faulty factual finding. The court found that the 15 acres of farmland was transferred on October 12, 2016, contemporaneous with the execution of the power of attorney. This is plainly incorrect. The testimony from the trial, as well as the submitted quit claim deed, demonstrate that the 15 acres of farmland were transferred nearly five months earlier on May 17, 2016. Thus, the trial court's finding that Brian had a confidential relationship with Lois and Calvin for purposes of that transaction is not supported by the evidence. Furthermore, Lois presented no evidence regarding her physical and mental condition, nor that of Calvin, as of May 17, 2016, such that the trial

18.

court could find that they were susceptible to undue influence. Lois also did not present any evidence that Brian exerted undue influence regarding that transaction. Instead, the only evidence that was presented was Lois's testimony that she must have intended to transfer the property, her testimony that she did not think that Brian was trying to unduly influence her to give him the property, Brian's testimony that the transfer was partly for purposes of protecting the property from potential creditors for the payment of medical expenses, and Brian's testimony that he received the property instead of Deborah due to their respective relationships with Lois and Calvin at the time. Even if we were to agree with the trial court that Brian's testimony on the subject was not credible, Lois's own testimony and her failure to produce additional evidence regarding the May 17, 2016 transfer leads to the conclusion that the trial court's decision was not supported by competent, credible evidence.

{¶ 48} As to the January 21, 2017 transfer of the remaining two acres, which included the family home, we similarly find that the trial court's decision is not supported by competent, credible evidence for many of the same reasons as the May 17, 2016 transfer. An important distinction between the two transfers is that by January 21, 2017, Brian had been named attorney in fact for Lois and Calvin. Appellants concede the existence of a confidential relationship based upon this fact, even though Brian did not exercise any authority on Calvin and Lois's behalf pursuant to the power of attorney. *See Bayes* at ¶ 50 ("[T]he existence of a relationship giving rise to undue influence does not depend on the use of a power of attorney."). However, appellants rebutted the

19.

presumption of undue influence by virtue of the quit claim deed which contained an attestation by the drafting attorney that Lois and Calvin's signatures on the deed were the product of their own free will, and by Lois's testimony that she did not feel that Brian unduly influenced her to transfer the property.[3]

{¶ 49} Lois then failed to carry her ultimate burden to prove by clear and convincing evidence that the transfer was the product of undue influence. Deborah testified that Calvin suffered a head injury and was confused following the accident, but Calvin was released from the hospital the same day and there was no testimony that he was of unsound mind three months later when the property was transferred. In addition, while there was testimony that Lois had begun to experience symptoms of dementia as early as October 2016, there was no testimony regarding her state of mind in January 2017. Lois presented no evidence that Brian pressured or coerced her and Calvin, or took any actions that would suggest that he unduly influenced them. Essentially, Lois's entire argument is that the transaction occurred, and she does not think that there was a good explanation for it. Upon review of the record, we find that there is only unfounded speculation, not clear and convincing evidence, that Brian unduly influenced Lois and Calvin to transfer the family home to him.

---

[3] Although not relevant to our determination here, we are of the opinion that a transaction between a principle and an attorney in fact should be viewed with less skepticism where the attorney in fact does not exercise any of his authority, as opposed to where the attorney in fact acts on behalf of the principle to transfer money or property to himself.

20.

**{¶ 50}** Therefore, we hold that the trial court's decision as it pertains to the transfer of real property is against the manifest weight of the evidence.

### 2. Expenditure of Funds

**{¶ 51}** In contrast to the transfer of real property, we find that there is competent, credible evidence in the record to support the trial court's conclusion that appellants converted Lois's funds through undue influence. It is not disputed that Lois owned the funds in the checking account, which were funds that she received through social security and as benefits from Calvin's death. Appellants also concede that Lois was susceptible to undue influence by virtue of her progressing dementia. Further, regardless of whether appellants had a confidential or fiduciary relationship with Lois, they concede that they had the opportunity to exert undue influence.

**{¶ 52}** As to whether they actually exerted or attempted to exert that influence, the record supports the trial court's conclusion that Heidi orchestrated Lois's expenditures. Prior to Calvin's death, Lois lived a frugal life. Heidi was added to Lois's accounts after Calvin died, and removed herself after the funds were depleted. Significant sums of money were spent through pin transactions using Lois's debit card, but Lois appeared incapable of using such a method, and testified that she did not know what a pin was and had never used a pin. In addition, large transfers were done electronically, despite Lois's inability to use a computer. In addition, although Lois spent over $170,000 in a 19-month period, there was no testimony that Lois acquired many material possessions. Furthermore, some of the expenditures, such as the veterinary bills, were explicitly for

21.

Heidi's benefit. Finally, Heidi's testimony that Lois bought lots of things for other people was not credible in that she could not name any other person that Lois spent time with or for whom she purchased items.

{¶ 53} Therefore, based on these facts, we hold that the trial court's determination that appellants converted Lois's funds through undue influence is not against the manifest weight of the evidence.

### IV. Conclusion

{¶ 54} In sum, we hold that the trial court's decision is against the manifest weight of the evidence as it pertains to the transfer of real property, and is not against the manifest weight of the evidence as it pertains to the expenditure of funds. Accordingly, appellants' assignment of error is well-taken, in part, and not well-taken, in part.

{¶ 55} For the foregoing reasons, we find that substantial justice has not been done the parties complaining, and the judgment of the Fulton County Court of Common Pleas is affirmed, in part, and reversed, in part. The portion of the judgment awarding Lois $111,742.32 in damages is affirmed. The portion of the judgment declaring the property transfers null and void is reversed, and the matter is remanded to the trial court for a new trial on that claim. The parties are ordered to split evenly the costs of this appeal pursuant to App.R. 24.

Judgment affirmed in part,
reversed in part, and remanded.

22.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.     _____
              JUDGE

Thomas J. Osowik, J.

Myron C. Duhart, P.J.     _____
CONCUR.               JUDGE

            _____
               JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.